### 59.   POPE & FLEMING *v.* GRANITEVILLE MANUFACTURING COMPANY.

1. An oral agreement which relates to a subject-matter not within the statute of frauds, and which contains mutual promises, is not unilateral; nor is the contract rendered unilateral because only one of the parties signed a subsequently written letter stating the terms of the contract.

2. "Where a party seeks damages for the violation of a contract by the other party, the measure of his damages is not what he has suffered by performing his part, but what he has suffered by the failure of the other party."

Breach of contract, from city court of Richmond county—Judge Eve.   August 21, 1906.

Argued February 5,—Decided February 13, 1907.

*W. H. Fleming,* for plaintiffs.   *Bryan Cumming,* for defendant.

POWELL, J.   This case brings for review the judgment of the trial court sustaining a demurrer to the plaintiffs' petition.   We can best make plain the errors complained of and considered by setting forth with practical completeness the original and amended petition, and also the demurrer.   The petition, omitting formal parts, is as follows: "Pope & Fleming, a firm composed of Fred. B. Pope and Porter Fleming, both of said county, bring this action as plaintiffs against the Graniteville Manufacturing Company as defendant, and show:   (1) Said defendant is a corporation existing under the laws of the State of South Carolina, but doing business in said county of Richmond, and having a place of business and officers and agents located in said county of Richmond; and the cause of action hereinafter set out originated in said county of Richmond.   (2) On October 14, 1904, plaintiffs and defendant entered into a definite verbal contract, according to which plaintiffs were to store and finance for the defendant company 1,000 bales of cotton; the cotton was to be delivered by the defendant company at the warehouse of plaintiffs at any time after October 14, 1904; the defendant company was to have until Sept. 1, 1905, to remove it.   Plaintiffs were to pay for the cotton at its actual cost, and were to issue warehouse receipts to the defendant company; the defendant company was to give its notes to plaintiffs, payable in six months, with the warehouse receipts attached; the rate of interest was to be 6%, based on the New York rate, then quoted to plaintiffs 5%; and this profit of 1% interest was, at the time of making said contract, in contemplation of both parties thereto.   The cotton was to be insured for the defendant company, the premium to be paid by said company, and the insurance policies were to be taken out either by plaintiffs or by the defendant company.   The compensation to the plaintiffs for the storing, financing, and services to be rendered under said

contract was $1 per bale, or a total of $1,000, together with a margin of 1% interest on the six months note of the defendant company for the value of the 1,000 bales of cotton, which amounted to about $50,000. (3) The above-mentioned contract was made verbally with the plaintiffs by T. I. Hickman, president of the defendant company, and the said contract was fully and completely agreed to by both parties thereto, and the said T. I. Hickman was the duly authorized agent and officer of the said defendant company, and had authority to make said contract. On the same date, to wit, October 14, 1904, the terms of said verbal contract were placed in writing, in the form of a letter addressed to the defendant company, which letter was duly delivered to Mr. T. I. Hickman, president of the defendant company. The following is a copy of said letter:·

'Graniteville Mfg. Co., Augusta, Ga.                    10/14/4.

'Dear Sir,—We beg to confirm contract made with you to-day to store for your account 1,000 bales of cotton. About 700 bales are to be placed in our close storage, the balance in open storage. Our charge to be $1.00 per bale. You to deliver the cotton at our warehouse at any time from this date on, and you are to have until Sept. 1, 1905, to remove it. We agree to pay for the cotton at actual cost, and to issue you warehouse receipts. You are to give us your note, payable in six months, with said warehouse receipts attached. The rate of interest to be 6%, based on present New York rate quoted to us of 5%. We to insure the cotton for your account, you pay the premium, or you to handle the insurance. We think these terms as mentioned cover the transaction, and we will thank you to confirm same.        Yours truly,

                                        Pope & Fleming.'

(4) Subsequently Mr. T. I. Hickman, president of the defendant company, acknowledged in writing the existence of said contract, in a letter addressed to the plaintiffs, dated January 30, 1905. A copy of said letter is as follows:

                        'Augusta, Ga., January 30, 1905.

'Messrs. Pope & Fleming, Augusta, Ga.

'Gentlemen,—Referring to the agreement about storage, made with you last October, I beg to request that you make an earnest effort to re-rent this compartment for our account. There seems absolutely no possibility of our buying any quantity of cotton to

store at this time; and to be perfectly frank, we are not sure that we desire to do so. If the writer had been in the office when cotton was down as low as 6⅝ cents, there would have been little, if any, doubt of our carrying out our agreement with you to the letter. I certainly would appreciate anything you can do for us under the circumstances, though, as the matter stands now, we will be practically indebted to you for the storage of the 1,000 bales for six months unless you can come to our rescue. With kind regards,                     Yours truly,

T. I. Hickman, President.'

(5) In pursuance of said contract plaintiffs reserved in their own warehouse space for 1,000 bales of cotton from October 14, up to about November 11, 1904, at much inconvenience and expense to themselves. On November 11, 1904, they made a contract with Alexander & Alexander for storage room in their warehouse for 1,000 bales of cotton, in order to be in readiness to carry out their contract with the defendant company, the warehouse of said Alexander & Alexander being in all respects as safe and secure as the warehouse of plaintiffs, and calling for no higher rate of interest. For the storage room so rented from Alexander & Alexander plaintiffs were obliged to pay the sum of $500. (6) The defendant company failed to carry out its part of the contract by furnishing the cotton for storage as agreed upon, but left the plaintiffs under the impression that the cotton would be furnished; and plaintiffs held themselves at all times in readiness to care for the same, and it was not until January 30, 1905, that the defendant company made any suggestion or intimation that the plaintiffs should re-rent the storage room then being reserved for the defendant company, as shown by the letter set out in paragraph 4; and in that letter the president of the defendant company admitted an indebtedness for the storage of 1,000 bales of cotton for six months, in accordance with that contract. Plaintiffs made all reasonable efforts to re-rent the storage room which they had reserved for the benefit of the defendant company, but without success. (7) By breach of said contract as aforesaid, plaintiffs have been damaged as follows: $1 per bale for storing and financing 1,000 bales of cotton, $1,000; 1% interest on $50,000 for six months, $250; total, $1,250. (8) As against this sum of $1,250 plaintiffs admit that there should be a credit of $105.62½ for

the temporary use by plaintiffs of the portion of the storage room rented from Alexander & Alexander while the same was being held in readiness for the defendant company, leaving a balance of net damages of $1,144.37½, with interest thereon from September 1, 1905; and for this sum plaintiffs pray judgment against the defendant company. (9) Wherefore plaintiffs pray," etc.

At the hearing the plaintiffs filed the following amendment: "(1) By adding to paragraph two of the original petition the following, to wit: 'Said contract as above set out was fully agreed to by both parties at a personal interview on the morning of October 14, 1904, prior to the writing of the letter of that date by Pope & Fleming as set out in paragraph three of the original petition, which letter merely reduced to writing what had already been agreed to and accepted as binding by both parties; and plaintiffs fulfilled every obligation resting on them thereunder, except such as they were prevented from fulfilling by the breach of said contract by defendant; and plaintiffs stood ready at all times to perform all their obligations under said contract, and promptly made definite arrangements to carry the cotton and finance the transaction in accordance with the intent and terms of said contract, and the defendant company positively agreed to furnish the 1,000 bales of cotton for storage on the terms set out in paragraph 2 of the original petition, said agreement being made by T. I. Hickman, president of the defendant company, on October 14, 1904, as a part of the original contract prior to the writing of the letter of that date.' (2) By striking out from the last line of paragraph 2 of the original petition the following word, sign, and figures 'about $50,000;' and inserting the following, to wit: '$54,375, according to the highest price on any day between October 14, 1904, and September 1, 1905, and $32,812.50, according to the lowest price on any day between those dates, and $45,000, according to the average price between those dates.' (3) By adding to paragraph 5 of the original petition the following: 'Under the terms of said contract there was no requirement or specification that the cotton should be stored in a particular warehouse then occupied by plaintiffs, but the intent and meaning of said contract was that the storage could be made by reserving space in plaintiffs' warehouse, or by securing space equally as safe and good in another warehouse; and the space was secured and paid for in

the warehouse of Alexander & Alexander, which was as safe and good in all respects as that of the plaintiffs' warehouse, the two warehouses being in close proximity. But plaintiffs could and would have stored all of said 1,000 bales in plaintiffs' own warehouse had defendant demanded or requested the same, and could and would have stored an equal number of bales of their own cotton in the warehouse of Alexander & Alexander.' "

The demurrer was upon the following grounds:   "(1) The plaintiffs, by the allegations in their petition, fail to set forth any cause of action against the defendant.   (2) For further grounds of demurrer, it appears from plaintiffs' petition that the terms of the alleged contract were reduced to writing in a certain letter bearing date October 14, 1904, and it appears from the terms of the contract as thus set out, and as otherwise explained in other portions of plaintiffs' petition, that there was no mutuality in the contract, and that the so-called contract was no more than a continuing offer on the part of Pope & Fleming to do certain things for the defendant at a certain rate of compensation, which until accepted and acted upon by the defendant, Pope & Fleming were at liberty to withdraw therefrom; and being at such liberty to withdraw, the defendant is not bound.   (3) For further ground of demurrer defendant says, even if, under the terms of the alleged contract, Pope & Fleming were bound to stand ready to furnish storage, do the financing, and loan the money upon the terms stated by them, there was no obligation resting upon the defendant to take advantage of or pay for the accommodation which plaintiffs contend that they contracted to furnish.   (4) For further grounds of demurrer, it appears, from the allegations of plaintiffs' petition, that the defendant was to pay one dollar a bale, not merely for storing, but for both storing and financing. It appearing from the allegations of the petition that by the term 'financing' is meant the procuring and furnishing the necessary money to purchase the cotton, even if the plaintiffs were entitled to damages growing out of the breach of the alleged contract, through failure to rent their warehouse, they would not be entitled to recover for services for financing when they were never called upon to perform such services, or to procure such money. , Wherefore all portions of the plaintiffs' petition which claim to recover anything for financing should be stricken, and especially the first item of damage claimed

in the seventh paragraph of plaintiffs' petition. (5) Defendant further demurs to plaintiffs' petition, and, for grounds of demurrer, says that it appears from the allegations of the petition that the alleged contract was for the storage of cotton in the warehouse of Pope & Fleming. It further appears, from the allegations of the petition, that Pope & Fleming did not reserve their warehouse for the purpose of accommodating the cotton of the defendant, but that they fully occupied the same with other cotton, and were not in position after November 11, 1904, to have complied with their alleged contract; and it being no part of the alleged contract that the defendant should store cotton in other warehouses, there could be no recovery by Pope & Fleming for the amount paid by them for rental of another warehouse, much less any recovery by them of a profit on the rental of such other warehouse; it further failing to appear from the petition that, at the time defendant's president wrote the letter containing the alleged admission of an obligation upon the part of the defendant to pay something on account of storage, the defendant knew of the effort on the part of Pope & Fleming to substitute another warehouse for the storage of the defendant's cotton than the warehouse of Pope & Fleming. Wherefore defendant prays that all portions of the petition which claim to recover damages on account of the renting of Alexander & Alexander's warehouse be stricken, and especially the first item of damage of the 7th paragraph of plaintiffs' petition. (6) For further grounds of demurrer, defendant says there is nothing in the alleged contract which contemplated or required the defendant paying to the plaintiffs a profit of one per cent. difference in the rate at which they could borrow from others and might lend to defendant, but, under the alleged contract, the defendant was only to pay interest for money furnished by plaintiffs for purchasing cotton. In other words defendant was to pay for the use of plaintiffs' money, and not to pay the plaintiffs a profit between what they could borrow in other places and loan to the defendant. And the plaintiffs not having been called upon to loan their own money, the defendant should not be called upon to pay the plaintiffs interest on money not so loaned, unless it had been shown, from the allegations of the petition, that plaintiffs kept money lying idle so as to be in position to meet their alleged obligations to defendant. Wherefore, defendant prays that

all portions of the petition which seek to recover one per cent. interest of fifty thousand dollars for six months be stricken, and especially the second item of damages of the seventh paragraph of plaintiffs' petition. (7) For further ground of demurrer, defendant demurs specially to so much of the fourth paragraph of plaintiffs' petition which alleges the value of one thousand bales of cotton as amounting to fifty thousand dollars, and, for grounds of demurrer, says that the allegation of 'about fifty thousand dollars' is vague and uncertain, and not sufficiently definite. The court will take judicial knowledge of the fact that the commodity cotton varies largely in price, and it is mere guesswork upon the part of the plaintiffs, alleging that the value of the cotton which might have been paid for by them might have been about fifty thousand dollars. Wherefore defendant prays that these portions of plaintiffs' petition be stricken, and especially the second item of damages of the seventh paragraph of plaintiffs' petition."

1. We have no difficulty in arriving at the conclusion that the petition as amended sets forth a cause of action. The oral contract set up in the petition was neither unilateral nor so indefinite as to be incapable of enforcement. It was not unilateral, for it was supported by the mutual promises of the parties. On the one hand, the plaintiffs, being warehousemen, agreed to finance and store for the defendant one thousand bales of cotton to be delivered at any time after October 14, 1904, and to be removed not later than September 1, 1905; also to pay for the cotton for the defendant at actual cost, and to deliver the warehouse receipts to the defendant company. On the other hand, the defendant agreed to deliver the cotton at the warehouse (for the expression "to be delivered by the defendant company at the warehouse of plaintiffs" can have no other reasonable intendment), to pay the plaintiffs one thousand dollars for the services of financing and storing the cotton, to give notes for the borrowed money, and to pay the plaintiffs a rate of interest which would give them a profit of 1% in addition to the rate which they would have to pay for the money in New York. It was not too indefinite to be capable of enforcement, for all the terms were either actually certain or capable of being rendered certain. It was conceded, in the argument, that the agreement was not within the statute of frauds, and therefore required no written evidence to make it effective. If

the subject-matter of the contract were of such character as to render the statute of frauds applicable, the insistence of counsel for the defendant that the contract was never created would be well founded; for, under repeated decisions of the Supreme Court, the letter written by the plaintiffs to the defendant and set out in the record could in that event be regarded as no more than a mere offer, requiring performance or written acceptance by the opposite party to enlarge it into a contract. Nor would the letter, which was written by the president of the defendant company to the plaintiffs, and which is also set out in the record, have been a sufficient acknowledgment of the contract within the purview of that statute. *Sivell* v. *Hogan,* 119 *Ga.* 171.

Plaintiffs' suit, however, is not based upon these writings, but upon the oral agreement. These letters have value as evidence tending to show that an oral contract was made, and were doubtless introduced into the petition with a view either of setting out all the circumstances surrounding the transaction, or with the other permissible purpose of having the defendant admit by his answer the truth of the allegations in regard to them, thereby dispensing with the necessity of the plaintiffs' proving them on the trial. Certainly it is true that if it appears that the contract as expressed in the plaintiffs' letter was accepted, the writing would be the highest evidence of the terms of the contract. *Woolbright* v. *Sneed,* 5 *Ga.* 167; *Bryant* v. *Booze,* 55 *Ga.* 439 (5); *Zachry* v. *Stewart,* 67 *Ga.* 218 (2); *Gray* v. *Phillips,* 88 *Ga.* 199 (1). Since the terms set up in the plaintiffs' letter are in substantial accord with the allegations of the petition as to the oral agreement, and since it would have to be shown that the contract proposed in the writing had become complete by acceptance, before the prior negotiation should be considered as merged therein, the contentions of the defendant seem to be equally untenable from this as from the other aspect. The petition also relieves itself from the objection, made by the demurrer, that the plaintiffs discharged the defendant from the contract by failing to reserve room in their warehouse for the cotton and by renting a portion of another warehouse for that purpose; for the allegations of the petition (which as against the demurrer are taken as true) are that "Under the terms of said contract there was no requirement or specification that the cotton should be stored in a particular warehouse then

occupied by plaintiffs, but the intent and meaning of said contract was that the storage could be made by reserving space in plaintiffs' warehouse, or by securing space equally as safe and good in another warehouse; and the space was secured and paid for in the warehouse of Alexander & Alexander, which was as safe and as good in all respects as that of the plaintiffs' warehouse, the two warehouses being in close proximity. But plaintiffs could and would have stored all of said 1,000 bales in plaintiffs' own warehouse had defendant demanded or requested the same, and could and would have stored an equal number of bales of their own cotton in the warehouse of Alexander & Alexander."

2. The demurrer also questions the measure of damages set up in the petition. This presents questions not entirely free from difficulty. "Where a party seeks damages for the violation of a contract by the other party, the measure of his damages is, not what he has suffered by performing his part, but what he has suffered by the failure of the other party." *Railroad Co.* v. *Hodnett,* 29 *Ga.* 461. The defendant having contracted with the plaintiffs to borrow from them the money necessary to purchase the one thousand bales of cotton and to pay them a rate of interest which would give them a profit of one half of one per cent. (the amount was to run only six months) above the price they would have to pay for the money, it seems clear that, by the breach of the contract in this respect, the defendant has damaged the plaintiffs in a sum equal to one half of one per cent. of what would have been the purchase price of the cotton. We have also concluded that the damages accruing to plaintiffs by reason of the defendant's breach of the contract in failing to deliver the cotton, that plaintiffs might store and finance it, may be measured as follows. The plaintiffs will be entitled, primarily, to recover the $1,000 agreed to be paid for this service, less any expense saved, or financial benefit accruing to them by reason of their not having to perform their undertaking under the contract. Upon ascertaining that the defendant could not or would not comply with the contract, it became the duty of the plaintiffs, so far as reasonable, to diminish the damage, by letting the storage space to others or by using it themselves. Such sums, so realized, should also be credited in diminution of the damages. If, as alleged by the plaintiffs, it was in accordance with the contract that the defendant's cotton

might be stored in warehouses other than their own, and the plaintiffs, in order to perform their part of the contract, secured storage room elsewhere than in their own warehouse, the right of the defendant to claim a diminution would not arise unless the plaintiffs, by ordinary diligence, could have used to profit the space left vacant (whether reserved in their own warehouse or secured by them elsewhere) by reason of the defendant's failure to deliver the cotton for storage. If the contract did not contemplate that the cotton was to be stored elsewhere than in the plaintiffs' own warehouse, and the plaintiffs used the space which would have been taken up in the storage of the defendant's cotton for the storage of cotton belonging to themselves or other customers, the value of such space so used should be credited in diminution of the damage; but this should be taken with the qualification that if, in order to lessen the damage occasioned by the defendant, the plaintiffs stored cotton in their own warehouse in the space which was to be used by the defendants, and in order to do this were obliged to leave unused other space contracted for by them, in which they might have stored the cotton other than the defendant's, the plaintiffs may set off against the credit thus accruing to the defendant the price paid for such unused space, provided the same does not exceed the amount so to be credited to the defendant. We think that we have made it plain that the actual expense saved to the plaintiffs by not having to handle, store, and finance the defendant's cotton is in any event to be credited off the one thousand dollars.                    *Judgment reversed.*